## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————

RAFAEL PARKER,                            )
                                          )
              Plaintiff,                  )        Civil Action No. _____
                                          )
       v.                                 )
                                          )
THE UNITED STATES                         )
       OF AMERICA,                        )        **JURY TRIAL DEMANDED**
                                          )
              Defendants.                 )

———————————————————————

Plaintiff Rafael Parker brings this complaint against the United States of America

pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Plaintiff has exhausted his

administrative claims by filing the required administrative tort forms with the Defendant and

having his claims denied by the Federal Bureau of Prisons.

## INTRODUCTION

On August 26, 2016, Rafael Parker was admitted to Christus St. Elizabeth Hospital. He

had been bleeding for 40 hours and had not eaten for two days. An x-ray revealed that Mr. Parker

had suffered a broken jaw—with fractures to the left and right sides of his lower jawbone—and

that his teeth had been forced out of alignment. As a result of his injuries, Mr. Parker required

bilateral jaw surgery to insert metal plates and screws to hold the bone together. Recovery from

this procedure required that Mr. Parker's jaw be wired shut for more than a month, during which

time he was restricted to a diet of pureed meals. Mr. Parker suffered these injuries when

correctional officers of the United States Federal Bureau of Prisons knocked him to the ground,

put a knee on his back as he lay defenseless, subsequently handcuffed him, and then punched

him repeatedly on both sides of his face, before leaving him for days without proper medical attention.

Two days prior, on August 24, Senior Correctional Officer Timothy Ryan was escorting Mr. Parker to the Lieutenant's Office in Beaumont Penitentiary. Mr. Parker wore hand restraints and posed no threat to officers or inmates. Once inside the holding cell, Mr. Parker turned his back to his escorting officers, at which point Officer Ryan charged Mr. Parker, knocking him to the ground. Officer Ryan then held his knee on Mr. Parker's back to ensure Mr. Parker could not escape as he and at least two other officers repeatedly punched both sides of Mr. Parker's face. Throughout the assault, Mr. Parker was completely defenseless.

The Penitentiary and, more broadly, the Bureau, neither investigated the assault nor provided Mr. Parker with any form of care, protection, or redress but instead covered up the officers' misconduct against Mr. Parker. Officer Ryan claimed that he used the *least* force necessary to gain control of a supposedly aggressive Mr. Parker. Hospital records documenting Mr. Parker's injuries prove otherwise. The officers' stories lacked corroboration—even contradicting each other—and neither officer was willing to explain the severity of Mr. Parker's injuries. Instead, Beaumont Penitentiary subjected Mr. Parker, the victim of an assault, to a Disciplinary Hearing and sanctions.  The officers' assault of Mr. Parker and the Bureau's retaliation against Mr. Parker were not isolated incidents but rather part of a larger pattern of serious mistreatment of inmates at the hands of officers charged with their care and of institutional cover-up by officials entrusted with the fair and safe administration of the correctional system.

Having exhausted all administrative claims, Mr. Parker now turns to this Court for relief.

## JURISDICTION AND VENUE

This Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1346(b)(1) because they arise under the laws of the United States and are brought to recover damages for personal injury caused by the wrongful and negligent acts of employees of the United States acting within the scope of their employment.

Venue is proper under 28 U.S.C. § 1391(b)(1)-(2) because Plaintiff is a citizen and current resident of this District.

## PARTIES

### Plaintiff

1. Plaintiff Rafael Parker is a citizen of the District of Columbia and is currently detained in the D.C. Central Detention Facility.

2. During the relevant time period of the incidents herein, Plaintiff was a detainee of the United States Penitentiary at Beaumont (hereinafter "Beaumont Penitentiary" or "Beaumont"), based in Jefferson County, Texas.

3. Mr. Parker is 5 feet, 9 inches. At the time of his assault, he weighed 172 pounds.

### Defendant

4. Defendant United States of America is sued for Mr. Parker's injuries and ongoing harm caused by the negligent and wrongful acts and omissions of its employees.

5. Senior Correctional Officers Timothy Ryan (hereinafter "Officer Ryan"), K. LeCount (hereinafter "Officer LeCount"), M. Osburn (hereinafter "Officer Osburn"), and an unknown officer (hereinafter "Officer X"), and Lieutenants T. Fazekas and C. Matt, along with medical professionals Sreedhar Polavarapu, M.D. (hereinafter "Doctor Polavarapu") and Patricia Rose, R.N. (hereinafter "Nurse Rose"), were employees of the Federal Bureau of

Prisons (hereinafter "the Bureau"), an agency of Defendant United States during the relevant timeframe.

6. Officers Ryan, LeCount, Osburn, and X and Lieutenant Fazekas were on duty on August 24, 2016, during the time of the assault. Lieutenant Matt conducted the Bureau's investigation into the assault on August 25, 2016. Doctor Polavarapu and Nurse Rose attended to Mr. Parker on or around August 25, 2016 following the assault. These employees were acting within the office and scope of their employment under circumstances where the United States, if a private person, would be liable to Plaintiff in accordance with the laws of Texas. *See* 28 U.S.C. § 1346(b).

## FACTUAL ALLEGATIONS

### Bureau Correctional Officers Battered and Assaulted Mr. Parker

7. On August 24, 2016, at approximately 4:30 PM, Mr. Parker was woken up in his cell and escorted to the Lieutenant's Office by three or more officers, one of whom was Officer Ryan, where he was to wait in a holding cell. Mr. Parker was in hand restraints as he was being escorted.

8. Visits to the Lieutenant's Office are generally for addressing disciplinary actions. Mr. Parker was not told why he was being taken to the Lieutenant's Office.

9. Upon information and belief, the Lieutenant's Office is routinely occupied by lieutenants conducting day-to-day business. When they arrived, the office was deserted.

10. Beaumont Penitentiary's prison regulations prohibit correctional officers from entering the Lieutenant's Office and its holding cell without either a video-recording device or a Lieutenant present. This policy is specifically in place because Lieutenants' offices do not have surveillance cameras. Upon information and belief, none of the correctional officers

escorting Mr. Parker were carrying any recording devices from the time Mr. Parker was taken from his cell until the assault.

11. Mr. Parker entered the holding cell alone as instructed by Officer Ryan. Officer Ryan closed the door, and on Officer Ryan's orders, Mr. Parker put his hands through the cuff port so that the officer could remove his handcuffs. Subsequently, Officer Ryan broke protocol and entered the holding cell without a recording device or lieutenant present. He instructed Mr. Parker to turn around, face the wall, place his hands on the wall above his head, and remove his shoes.

12. With his hands on the wall and his back to the officers, Mr. Parker shook off his shoes while criticizing Officer Ryan about the officer's reputation for aggressively handling inmates. It is upon information and belief that Officer Ryan had recently assaulted another inmate at Beaumont.

13. Criticisms and similar forms of repartee are common between incarcerated individuals and correctional officers. The adversarial nature of correctional officers' work as authority figures in a prison requires them to tolerate words that are merely offensive.

14. Officer Ryan first gave Mr. Parker a pat down, ultimately turning up nothing, and then walked towards the holding cell door. However, with Mr. Parker still facing the wall and his hands placed against the wall, Officer Ryan abruptly turned and charged Mr. Parker, intentionally knocking him to the ground.

15. Officer Ryan pinned Mr. Parker face down on the ground to prevent escape and forced his hands back into restraints. While Officer Ryan's knee dug into Mr. Parker's back, Officer LeCount and at least one other officer, Officer X, entered the cell and began beating Mr. Parker's face and head. Because his hands were cuffed behind his back, Mr. Parker attempted

to protect the left side of his face by turning his head. At that point, Officer Ryan began

punching the right side of Mr. Parker's face. Mr. Parker was ultimately defenseless.

16. Upon information and belief, the holding cell where the officers assaulted Mr. Parker was

located within earshot of the staff lounge and offices. Other correctional officers and prison

officials would have been able to hear the attack. However, no staff responded to the noise or

intervened.

17. Upon information and belief, Officer LeCount was already present when Officer Ryan

knocked Mr. Parker to the ground. In contradiction to his report, Officer LeCount took part in

the attack from the beginning.

18. No officers sustained any injuries related to this incident.

19. Mr. Parker was eventually escorted to the prison medical unit without further incident.

### *Officer statements of the assault are inconsistent and uncorroborated*

20. Officer statements about the incident conflict in material ways.

21. Officer Ryan claims that he released Mr. Parker from his handcuffs once in the holding cell,

at which point, he claims Mr. Parker tried to swing at him. Officer Ryan further claims that

he and another correctional officer together applied hand restraints to Mr. Parker, though no

other officer reported doing this.

22. According to Officer LeCount's incident report, by the time he arrived on the scene, Officer

Ryan had already handcuffed Mr. Parker and brought him under control. Officer LeCount did

not indicate that any other correctional officer assisted Officer Ryan or was present. This

differs substantially from Officer Ryan's account, which reports that an officer assisted him

in applying hand restraints on Mr. Parker but fails to mention that officer's name.

23. Officer Ryan claimed Mr. Parker was acting aggressively because he was under the influence of alcohol or narcotics. Officers failed to conduct a breathalyzer or urine test on Mr. Parker in association with this incident, despite this being common procedure.

24. Officer Ryan claimed he used the *least* force necessary to subdue Mr. Parker. It is infeasible that the least force required by several trained officers to restrain a single, defenseless inmate could result in fractures to both sides of Mr. Parker's jaw and a laceration above his left eye.

25. Upon information and belief, prison protocol mandates that correctional officers receive medical examination following any incident. After examination, incident reports noted that no officer sustained any injuries related to this incident.

*Mr. Parker's injuries were severe and have lifelong impact*

26. The correctional officers beat Mr. Parker so violently that he exhibited signs of concussion syndrome upon examination at the hospital.

27. As a result of assault by the officers, Mr. Parker sustained injuries to his head and face. Discovered to their full extent a day later, these injuries included a laceration above his left eye that bled considerably, several teeth being knocked out of alignment, and fractures on the left and right sides of his jaw. Hospital records note that Mr. Parker's jaw was significantly displaced.

28. Both jaw fractures impacted the roots of Mr. Parker's teeth, causing long-term injury to his teeth. As a result, Mr. Parker has dealt with painful tooth decay in the years since his assault and has undergone several extractions of teeth that were irreparably damaged.

29. Treatment of the two fractures required bilateral jaw surgery in which metal plates and screws were permanently fixed to both sides of his jaw. For many days after undergoing

surgery, Mr. Parker required a combination of Tylenol and Codeine every four hours to manage his unbearable pain.

30. Mr. Parker stayed in Christus Hospital for five days. Throughout that period, he required emotional support to help process the traumatic experience of being assaulted, left injured, untreated, and in isolation in the Special Housing Unit ("SHU") for two days.

31. Recovery from this procedure required Mr. Parkers jaw to be wired shut for 35 days, during which time he was limited to a diet of Ensure, broth, and pureed foods. After just 17 days on this liquid diet, Mr. Parker suffered noticeable weight loss and reported bouts of dizziness. By the time Mr. Parker was able to begin eating solid foods again, he had lost more than 20 pounds.

32. Mr. Parker was kept in the SHU beyond the duration of his recovery. Mr. Parker was not released back to his typical housing unit until six months later.

33. Mr. Parker had to be kept under close surveillance during his recovery, and doctors instructed correctional officers to keep wire cutters on hand while monitoring Mr. Parker's cell. In the event that Mr. Parker choked or vomited, officers would need to cut his jaw open.

*The officers' use of excessive force caused Mr. Parker's injuries*

34. Upon information and belief, Mr. Parker's jaw could not have sustained multiple bone fractures if Officers Ryan, LeCount, and X—three armed, trained, and experienced correctional officers—used the *least* force necessary to restrain him. None of the incident reports filed by officers provide any specificity as to how Mr. Parker received such severe injuries. Instead, they offer only that they placed Mr. Parker on the ground.

35. Throughout the assault, Mr. Parker was in hand restraints and defenseless.

36. Mr. Parker was kept in isolation in the SHU from the time of the assault until he was taken to Christus Hospital on August 26. There was no opportunity for anyone else to have inflicted these injuries before they were detected by x-ray.

37. The extent and nature of his injuries led Christus Hospital examiners to conclude that an assault occurred. As a result, the examiners conducted an assault report, pursuant to their protocol, and recorded that Mr. Parker's injuries were the result of an assault by fists.

**Bureau Medical Staff Negligently Administered Treatment to Mr. Parker**

38. Bureau medical staff failed to meet the professional standards expected of doctors and nurses when they examined Mr. Parker on August 24 and 25.

39. On August 24, no more than thirty minutes after the assault, Nurse Rose conducted a medical assessment, noting lacerations and contusions on Mr. Parker's temples. She also noted that Mr. Parker had blood around his nose and mouth, but ultimately, she reported only minor injuries.

40. Nurse Rose cleaned the blood from his face but provided Mr. Parker no other treatment.

41. Mr. Parker cooperated with Nurse Rose throughout the examination to the best of his ability. Staff were ill equipped to handle the severity of Mr. Parker's injuries, so when he was unable to answer the nurse's questions orally or open his mouth for examination, Nurse Rose assumed and recorded that Mr. Parker was being uncooperative. Proper training would have led any medical professional to realize that the injuries Mr. Parker sustained prevented him from even the simple task of opening his jaw and would have prompted them to investigate Mr. Parker's injuries more thoroughly.

42. Mr. Parker was being watched by correctional officers, at least some of whom were part of his assault, for the entirety of his initial medical visit immediately after the assault. Upon

information and belief, the presence of these officers was used to intimidate Mr. Parker. Nurse Rose failed to account for this impact on Mr. Parker and to inquire meaningfully into the extent and cause of his injuries.

43. Despite continuing to bleed from the mouth and being unable to talk or eat, Mr. Parker was escorted directly to the SHU where he was left overnight.

44. Mr. Parker was still bleeding and in excruciating pain the next morning when Tina Wise (hereinafter "Nurse Wise"), the sick call nurse, encountered him in the SHU. Nurse Wise noted that Mr. Parker looked injured and, accordingly, conducted a medical exam. Her exam reported that Mr. Parker was experiencing significant pain, that his face was swollen, and that he was only able to slightly open his mouth.

45. After conducting her exam, Nurse Wise noted that Mr. Parker should receive an x-ray immediately.

46. The x-ray was not conducted until five hours later, on the afternoon of August 25.

47. After Dr. Polavarapu took four x-rays, and while Mr. Parker was still in the room, another Bureau medical staff person noted aloud that the images showed that his jaw had been broken. Dr. Polavarapu hushed his colleague, asserting that the x-ray needed to be sent off to be read.

*Bureau medical staff denied Mr. Parker timely treatment*

48. Mr. Parker was not given an x-ray by medical staff in the SHU to examine his facial injuries until noon on August 25, nearly 24 hours after the assault that broke his jaw in two places. That x-ray found two fractures on either side of Mr. Parker's jaw and recommended CT scans to look for further injuries.

49. However, Mr. Parker was not taken to a hospital to receive these CT Scans and necessary treatment until a full day later, on August 26.

50. By that point, Mr. Parker's swelling was so extensive that the surgeon had to wait three days for the swelling to decrease before he could perform surgery. Mr. Parker would not have had to wait three additional days for surgery had he been admitted to Christus Hospital sooner.

51. In sum, it took five days from the time of his assault for Mr. Parker to receive the necessary medical treatment.

**The Bureau is Culpable for its Officers' Assault on Mr. Parker**

*The Bureau was aware of Officer Ryan's history of violent conduct with inmates*

52. Upon information and belief, Officer Ryan had a reputation for being overly rough with inmates.

53. The Bureau acted upon this information, demonstrating its knowledge of Officer Ryan's conduct. Upon information and belief, Officer Ryan was transferred to Beaumont Penitentiary from a lower security prison because of his involvement in a similar assault against an inmate. Rather than sanctioning Officer Ryan, which would admit fault in his previous assault, the Bureau transferred Officer Ryan to Beaumont, enabling him to continue his pattern of violent abuse.

54. The Bureau should have foreseen that Officer Ryan would assault one of its inmates before long.

55. Upon information and belief, not long before Mr. Parker was assaulted, another inmate at Beaumont Penitentiary was assaulted by Officer Ryan. That inmate was also punched in the head and face, suffering a fracture to his eye socket. In that instance, Officer Ryan filed a

similar report to the one he filed on August 24: claiming that the inmate had swung first and that he used the *least* force necessary.

56. Officer Ryan's tactic of falsifying reports to cover up his pattern of violent conduct against inmates was known to Beaumont. This is not an uncommon practice at Beaumont. Similar cover-up tactics have been employed by other officers in Beaumont Penitentiary and were recently brought to light. On January 8, 2020, two officers were charged with parallel allegations of assaulting inmates without justification and falsifying subsequent documentation and reports. One officer, former Lieutenant Khristal Ford, has since been convicted, and former Senior Correctional Officer Tavoris Bottley is awaiting trial.

*Beaumont Penitentiary knew that Officer Ryan and others involved in the assault were liable for Mr. Parker's injuries*

57. Officer Ryan was expressly prohibited from accompanying Mr. Parker to the medical exam after his assault because he was the one who had initiated force. As a result, Officer Osburn was called in to assist Officer LeCount and Officer X in shepherding a bleeding Mr. Parker to the medical unit.

58. All of the officers involved in the incident were kept away from Mr. Parker from the time he entered the SHU on the night of August 24 until he was released back into the general prison population six months later. Upon information and belief, Bureau staff transferred Mr. Parker to the United States Penitentiary at Pollock (hereinafter "Pollock Penitentiary") almost immediately after he was released from the SHU because they did not trust the assaulting officers around Mr. Parker.

59. Mr. Parker saw Officer Ryan only once during those six months. When Mr. Parker began filing what are supposed to be confidential internal prison reports, Officer Ryan appeared at his cell one day delivering Mr. Parker's meal. Understandably afraid of Officer Ryan's

intentions, Mr. Parker refused to eat the food that the officer brought. When Mr. Parker reported what Officer Ryan had done, prison staff admitted that he was not supposed to have approached Mr. Parker and assured that it would not happen again.

60. Beaumont Penitentiary chose not to investigate the role Officer Ryan and prison staff played in Mr. Parker's injuries.

61. Upon information and belief, Mr. Parker was kept in the SHU from the night of his assault through the duration of his recovery in order to conceal what had happened from other inmates. During this time, Mr. Parker was kept alone in his cell in spite of the fact that inmates in the SHU are typically assigned cell mates.

62. The United States Attorney's Office contacted Mr. Parker while he was housed in Pollock Penitentiary to investigate bringing charges against Officer Ryan pursuant to the hospital's assault report. However, apprehensive of the fact that Pollock Penitentiary is managed by the same agency and that news of such charges would travel quickly amongst Bureau employees, Mr. Parker declined to push for charges. Ultimately, he feared retribution at the hands of Bureau staff who had already done so much to protect the officers and who would soon decide his Disciplinary Hearing.

### The Bureau Improperly Manipulated its Adjudicatory Processes in an Attempt to Conceal the Assault

*Mr. Parker's disciplinary hearing was intentionally ill-informed*

63. Despite being the victim, Mr. Parker was subject to two disciplinary hearings for the assault.

64. Beaumont protocol requires that a disciplinary hearing be conducted within five days of any incident involving an inmate. Mr. Parker's first communication from Beaumont regarding his hearing was not until September 6, thirteen days after the incident.

65. Mr. Parker's Unit Disciplinary Committee ("UDC") hearing then occurred the day after this notice, on September 7, 2016. At the time of his UDC hearing, Mr. Parker's jaw was wired shut, and he was taking prescribed medication to manage the pain. Because Mr. Parker was still recovering from bilateral jaw surgery and in immense pain at the time of the hearing, he was not given the opportunity to fully represent his account. Upon information and belief, the Disciplinary Committee was aware of Mr. Parker's condition throughout the hearing.

66. The UDC assigned greater weight to the reporting officers' accounts than that of Mr. Parker. The UDC therefore found Mr. Parker guilty and subsequently passed its recommendation to the Disciplinary Hearing Office ("DHO") for further hearing.

67. Beaumont's protocol would have required video recording of this incident from each of the officers since it took place within a Lieutenant's Office. However, the UDC did not request video footage from the officers or take into account the absence of video footage when providing in its recommendation to the DHO.

68. A hearing conducted by the DHO eventually occurred on April 4, 2017, at which point Mr. Parker had already been transferred to Pollock Penitentiary.

69. The findings in the DHO Report were based solely on four staff reports, Mr. Parker's medical exam from August 24, and Lieutenant Matt's investigation of the incident. Notably, the findings did not consider video footage from any of the officers.

70. Lieutenant Matt began his investigation on August 25 at 10:15 AM and completed it at 10:20 AM. This investigation took only five minutes and was concluded before Mr. Parker had received any medical assessment.

71. The Disciplinary Hearing Officer gave greater weight to the statements of correctional officers than to Mr. Parker's account, despite the fact that the staff reports contradict each

other as to material facts and the report created by Lieutenant Fazekas merely restates Officer Ryan's account. There is no indication that Lieutenant Fazekas was present during the assault.

72. The Disciplinary Hearing Officer was negligent in considering only the August 24 medical record, as he had available to him more updated records dated August 25 indicating that Mr. Parker's jaw was broken. The Disciplinary Hearing Officer affirmatively chose not to consider any of the medical records that were created after Mr. Parker's jaw had been medically diagnosed as broken and the full extent of his injuries had been realized.

73. Upon information and belief, the Bureau intentionally sought only limited information to cover up any wrongdoing against Mr. Parker and other inmates and to quell an investigation into the institutional abuse of inmates at the hands of correctional officers.

*Mr. Parker's administrative tort complaint to the Bureau was wrongly denied*

74. Mr. Parker filed an administrative tort claim on July 11, 2018, in the Federal Bureau of Prisons South Central Regional Office for damages resulting from the assault at issue. Administrative relief was denied on December 10, 2018.

75. Mr. Parker appealed this decision for reconsideration with the Federal Bureau of Prisons South Central Regional Office. Reconsideration was denied on August 14, 2019. The Bureau indicated that the denial constitutes a final agency action which is appealable to this Court. Mr. Parker has exhausted his administrative claims and thereby proceeds to bring a federal tort claim.

**The Actions of Bureau Employees Left Lasting Effects on Mr. Parker**

76. Mr. Parker continues to experience stiffness and pain in his jaw, which pops when chewing and speaking. As a result of the surgery, Mr. Parker cannot open his mouth as wide as he

could prior to the assault. This, along with the stiffness, has permanently decreased Mr. Parker's ability to enunciate his speech.

77. Mr. Parker has suffered ongoing and material dental decay, discomfort, and distress as a result of the injuries he sustained from the assault. He continues to experience bouts of numbness in particular regions of his jaw and suffers ongoing gum pain. At least three of his teeth have been removed due to decay caused by damage to the root from his jaw injury. The process of decay and the eventual removals have caused Mr. Parker intolerable pain and, at some points, greatly impaired his ability to eat.

78. The assault and the Bureau's subsequent actions left Mr. Parker emotionally distressed. He required emotional support from Christus Hospital in the wake of his assault, but this limited intervention was not sufficient to address the full extent of his trauma. Mr. Parker continues to feel exposed and vulnerable within Bureau facilities, particularly around correctional officers, whom Mr. Parker does not have the freedom to maintain a safe distance from.

79. To the limited extent that he can, Mr. Parker now goes out of his way to avoid correctional officers who display a hot temper similar to that of Officer Ryan, fearful that he may be assaulted at any moment. Dealing with these officers gives Mr. Parker an aggravated feeling of anxiety and paranoia.

### CAUSES OF ACTION

### Count I. Battery

80. Plaintiff incorporates by reference all allegations set forth in points 1 to 79.

81. At all times relevant to this case, federal correctional officers acted within the scope of their employment by Defendant United States of America.

82. In performing the acts described herein, the correctional officers knowingly and intentionally caused harmful and offensive contact with Plaintiff's person. Specifically, Officer Ryan charged at Plaintiff, knocked him to the ground, pinned his knee on Plaintiff's back, and, along with at least Officer LeCount and Officer X repeatedly punched the left and right sides of Plaintiff's face.

83. As a direct result of the correctional officers' unlawful conduct as hereinabove alleged, Plaintiff has suffered fractures on either side of his jaw, malocclusion, permanent root damage to his teeth, a laceration to his left eyebrow, and heavy bleeding.

84. Plaintiff did not consent to the officers' willful, wanton, and malicious acts.

85. The actions described herein constitute the tort of battery under the laws of the State of Texas.

86. Under the Federal Tort Claims Act, Defendant United States of America is liable for these acts and omissions.

### Count II. Assault

87. Plaintiff incorporates by reference all allegations set forth in points 1 to 86.

88. At all times relevant to this case, federal correctional officers acted within the scope of their employment by Defendant United States of America.

89. As alleged hereinabove, each correctional officer conspired to and/or aided and abetted others to assault Plaintiff. Each correctional officer intended to cause and did cause Plaintiff to suffer bodily injury. Specifically, Officer Ryan held Plaintiff on the ground and placed his knee on Plaintiff's back to prevent escape, while he and at least Officers LeCount and X repeatedly punched Plaintiff in the left and right side of his face.

90. As a direct result of the correctional officers' unlawful conduct as hereinabove alleged, Plaintiff has suffered fractures on either side of his jaw, malocclusion, permanent root damage to his teeth, a laceration to his left eyebrow, and heavy bleeding.

91. The aforementioned conduct by the federal officers was willful, wanton, and malicious. The prison officers acted with knowledge of the fact that their conduct was certain to cause Plaintiff injury and ensured that Plaintiff could not escape.

92. The actions described herein constitute the tort of assault under the laws of the State of Texas.

93. Under the Federal Tort Claims Act, Defendant United States of America is liable for these acts and omissions.

## Count III. Use of Brutal and Unnecessary Force with Intent to Injure and Cause Bodily Harm

94. Plaintiff incorporates by reference all allegations set forth in points 1 to 93.

95. At all times relevant to this case, federal correctional officers acted within the scope of their employment by Defendant United States of America.

96. In performing the acts described herein, the correctional officers acted under color of authority in Beaumont Penitentiary.

97. Correctional officers, acting under color of authority, willfully used unnecessary and brutal force with intent to injure and cause bodily harm to Plaintiff. Specifically, the correctional officers, who held a position of responsibility, charged at Plaintiff, knocked him to the ground, restrained him to prevent escape, and repeatedly punched him in the left and right side of his face.

98. As a direct result of the correctional officers' unlawful conduct as hereinabove alleged, Plaintiff has suffered fractures on either side of his jaw, malocclusion, permanent root damage to his teeth, a laceration to his left eyebrow, and heavy bleeding.

99. Plaintiff was alone, defenseless, in hand restraints, and posed no threat to any of the three or more armed correctional officers or any other inmate.

100.    The aforementioned conduct by correctional officers was brutal and unnecessary. The correctional officers acted with knowledge of the fact that their conduct was certain to cause Plaintiff injury.

101.    The actions described herein constitute the tort of brutal and unnecessary force with intent to injure under the laws of the State of Texas.

102.    Under the Federal Tort Claims Act, Defendant United States of America is liable for these acts and omissions.

## Count IV. Negligence of Bureau Correctional Officers

103.    Plaintiff incorporates by reference all allegations set forth above in points 1 through 102.

104.    At all times relevant to this case, federal correctional officers acted within the scope of their employment by Defendant United States of America.

105.    Texas law imposes a duty of care on federal correctional officers to protect inmates' health and safety.

106.    The acts herein constitute breaches of their duty of care with respect to Mr. Parker by federal employees while acting within the scope of their office or employment.

107.    Plaintiff was alone, unarmed, in hand restraints, and posed no threat to any of the three or more armed correctional officers or any other inmate.

108.    The correctional officers' breach of duty was a proximate cause and a direct factor in Mr. Parker's pain, suffering, and continuing medical issues.

109.    The actions described herein constitute the tort of negligence under the laws of the State of Texas.

110.    Under the Federal Tort Claims Act, Defendant United States of America is liable for these acts and omissions.

### Count V. Negligent Supervision

111.    Plaintiff incorporates by reference all allegations set forth above in points 1 through 110.

112.    Texas law imposes a duty of care on correctional officers to protect inmates' health and safety.

113.    At all times relevant to this case, the United States Federal Bureau of Prisons had a duty to properly hire, supervise, and—when necessary—fire its personnel in order to protect prisoners against dangers reasonably likely to result from the absence of proper hiring, supervision, and firing. Officers Ryan, LeCount, and other unnamed officers acted within the scope of their duties as employees of the Bureau of Prisons.

114.    Upon information and belief, Defendant had actual knowledge of Officer Ryan's violent history with other inmates and of Officer Ryan's tactic of falsifying reports to cover up his violent conduct. Rather than adequately supervise or fire Officer Ryan after his first incidents, Defendants merely transferred Officer Ryan from a lower security prison to Beaumont Penitentiary, enabling his pattern of abusive behavior.

115.    Because of Officer Ryan's history of violence towards inmates and tactic of falsifying reports, the likelihood of the risk of him assaulting another inmate was foreseeable.

Defendant knew or should have known that Officer Ryan was not fit for his position as a correctional officer.

116.    Because Mr. Parker brought an administrative complaint regarding his assault, Defendant knew or should have known about the correctional officers' misconduct towards Mr. Parker. A cursory investigation would have shown that the Defendants' employees had breached prison protocol on numerous occasions, including but not limited to, when Officer LeCount and Ryan's testimony differed so substantially as to contradict each other, when at least three officers entered a Lieutenant's office without video recording or Lieutenant supervision, and when Mr. Parker sustained injuries that could not have been the result of the least force necessary.

117.    The Defendant failed to take any disciplinary action against the correctional officers involved, including Officer Ryan. Defendant breached its duty to use reasonable care in the supervision of its employees and to maintain a staff that is competent and fit for their position.

118.    Upon information and belief, the Bureau failed to take any steps in preventing Officer Ryan from visiting Mr. Parker's cell or to take any disciplinary action against Officer Ryan for this incident. Officer Ryan's history of violence towards inmates and covering up his violence made this foreseeable.

119.    The Bureau's negligent breach of duty was a proximate cause and a direct factor in Mr. Parker's pain, suffering, and continuing medical issues.

120.    The actions described herein constitute the tort of negligent supervision under the laws of the State of Texas.

121.    Under the Federal Tort Claims Act, Defendant United States of America is liable for these acts and omissions.

### Count VI. Medical Malpractice by Bureau Medical Staff

122.    Plaintiff incorporates by reference all allegations set forth above in points 1 through 121.

123.    Texas law imposes a duty of care on medical staff to protect inmates' health and safety.

124.    The acts and omissions herein constitute breaches of the duties of care with respect to Mr. Parker by federal employees while acting within the scope of their office or employment.

125.    The medical staff breached their duty of care by not adequately treating Plaintiff's injuries and not investigating the extent of his injuries and the source of his pain. Mr. Parker was admitted to medical staff at Beaumont Penitentiary no more than thirty minutes after the assault. Medical staff performed an initial assessment, which recorded that Plaintiff sustained only minor injuries.

126.    Rather than provide a thorough medical examination, medical staff misreported that Plaintiff—who had just incurred a broken jaw—was uncooperative for refusing to open his mouth.

127.    Mr. Parker was provided with no further treatment and left in the SHU, despite continuing to bleed from the mouth and being unable to talk or eat.

128.    As such, Mr. Parker was left to suffer overnight until he was noticed by Nurse Wise while she conducted rounds in the SHU. Nurse Wise then conducted a medical investigation. Based on the results of Nurse Wise's examination, Mr. Parker received an x-ray examination through which he was admitted to Christus Hospital.

129.    Upon information and belief, Mr. Parker's injuries and suffering could have been mitigated had he been given adequate medical care earlier. By the time Mr. Parker was

admitted into Christus Hospital, his swelling had risen such that he could not presently receive surgery. Mr. Parker had to wait in agony for three additional days to receive bilateral jaw surgery.

130.    The medical staff's breach of duty was a proximate cause and a direct factor in Mr. Parker's pain, suffering, and continuing medical issues.

131.    The actions or omissions described herein constitute the tort of medical malpractice under the laws of the State of Texas.

132.    Under the Federal Tort Claims Act, Defendant United States of America is liable for these acts and omissions.

## Count VII. Intentional Infliction of Emotional Distress

133.    Plaintiff incorporates by reference all allegations set forth above in points 1 through 132.

134.    Officer Ryan and at least two other officers, in approaching Mr. Parker, escorting him to the Lieutenant's holding cell, and assaulting him without apparent cause or provocation, intentionally or recklessly caused Mr. Parker to suffer severe emotional distress.

135.    Officer Ryan and at least two other officers knew or should have known that approaching Mr. Parker, escorting him to the Lieutenant's holding cell, and assaulting him without apparent cause or provocation would cause him to fear for his physical safety long after the assault. Officer Ryan's history of violent conduct with inmates had already led to widespread fear and mistrust of correctional officers in Beaumont Penitentiary.

136.    The Bureau, through its agents and employees, intentionally or recklessly caused Mr. Parker to suffer severe emotional distress through its gross disregard for Mr. Parker's well-being in the days after his assault at the hands of correctional officers.

137.   The Bureau's failure to protect Mr. Parker from correctional officers known to have a history of violent conduct with inmates was outrageous and indecent.

138.   Further, the Bureau, through its agents and employees, intentionally or recklessly caused Mr. Parker to suffer severe emotional distress by manipulating the administrative process to deny him relief and instead subjecting him to disciplinary sanctions.

139.   As a direct and proximate cause of the Bureau's outrageous conduct, Mr. Parker continues to suffer mental and emotional distress.

140.   The actions or omissions described herein constitute the tort of intentional infliction of emotional distress under the laws of the State of Texas.

141.   Under the Federal Tort Claims Act, Defendant United States of America is liable for these acts and omissions.

**Count VIII. Civil Conspiracy**

142.   Plaintiff incorporates by reference all allegations set forth above in points 1 to 141.

143.   Texas law penalizes misuse of civil administrative procedure to deprive an inmate of their legal rights in order enable its officers to continue using brutal and unnecessary force with intent to injure and to intentionally inflict emotional distress upon its inmates.

144.   Bureau staff conspired at many stages of the process to cover up the truth of Mr. Parker's brutal assault and deny Mr. Parker meaningful recovery.

145.   Although Beaumont protocol requires that a hearing will be conducted within five days of any incident involving an inmate, Mr. Parker's first communication from Beaumont regarding his hearing was not until thirteen days after the incident.

146.   Upon information and belief, Mr. Parker was still in pain and recovering from his bilateral jaw surgery at the time of the hearing and was not given the opportunity to fully

represent his account. This was known to the hearing officers, who nonetheless proceeded with the hearing despite Mr. Parker's condition.

147.    The disciplinary hearing report based its findings solely on four staff reports and Mr. Parker's medical exam by the Bureau from August 24—weighing officer reports of the incident much higher than Mr. Parker's account, despite conflicts in their narratives. The report did not include any video footage, despite Beaumont protocol requiring that officers wear video recording equipment while inside the Lieutenant's Office.

148.    Beaumont Penitentiary did not conduct a meaningful investigation of the incident resulting in Plaintiff's actions, despite the severity of Mr. Parker's injuries. Further, Beaumont Penitentiary did not question the inconsistencies in the reports filed by Officers Ryan and LeCount or the lack of video footage. Instead, Beaumont discounted Plaintiff's complaint against the testimony of the correctional officers responsible for his injury.

149.    Upon information and belief, the Bureau intentionally sought only limited information to justify denying Mr. Parker's administrative appeal and to prevent further investigation of Officer Ryan's history of assaulting inmates, thereby enabling his pattern of violent conduct with inmates.

150.    This lack of an investigation ensured that Plaintiff's administrative filing would never have returned a verdict in his favor, thereby precluding any administrative relief for Plaintiff and subjecting him to intense emotional distress, leaving him feeling unprotected and vulnerable so long as he remains within a Bureau facility.

151.    Beaumont Penitentiary's moreover subjected Plaintiff to disciplinary sanctions in order to cover up its improper supervision of correctional officers and improper investigative process for assaults suffered by its inmates.

152.    On July 11, 2018, Mr. Parker filed an administrative tort appeal for damages resulting from the assault. Administrative relief was denied by the Bureau's South Central Regional Office on December 10, 2018. He appealed this decision, and it was ultimately denied on August 14, 2019. This constitutes a final agency action which is appealable to this court.

153.    The acts and omissions described herein constitute a civil conspiracy under the laws of the State of Texas.

154.    Under the Federal Tort Claims Act, Defendant United States of America is liable for these acts or omissions.

## DAMAGES

Plaintiff has suffered the following injuries for which he seeks full compensation under the law:

(a) Personal injuries resulting in fractures on either side of his jaw, malocclusion, permanent root damage to his teeth, a laceration to his left eyebrow, and heavy bleeding.

(b) Recurring pain and suffering.

(c) Mental and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

(a) ENTER JUDGMENT holding the Defendant liable to personal injury damages in the amount of $425,000;

(b) AWARD Plaintiff his costs and reasonable attorney's fees; and

(c) GRANT such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY**

Plaintiff hereby demands a trial by jury for all claims presented.


Dated: February 13, 2020                    Respectfully submitted,

                                            */s/ Aderson Francois*
                                            Aderson Francois (D.C. Bar No. 498544)
                                            CIVIL RIGHTS CLINIC
                                            GEORGETOWN UNIVERSITY LAW
                                            CENTER
                                            600 New Jersey Avenue NW, Suite 352
                                            Washington, DC 20001
                                            Phone: (202) 661-6721
                                            Aderson.Francois@georgetown.edu

                                            *Attorney for plaintiff*